# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# EASTERN DIVISION

| | | |
|---|---|---|
| **COPPERHEAD INDUSTRIAL, Inc.,** | } | |
| | } | |
| **Plaintiff/Counter Defendant,** | } | |
| **v.** | } | **Case No.:  1:18-cv-01228-ACA** |
| | } | |
| **CHANGER & DRESSER, Inc.** | } | |
| | } | |
| **Defendant/Counter Claimant.** | } | |

## MEMORANDUM OPINION

This case is before the court on the parties' proposed claim constructions with respect to disputed terms in four United States patents.

Plaintiff Copperhead Industrial, Inc. ("Copperhead") alleges that Defendant Changer & Dresser ("C&D") has infringed United States Patent Numbers 8,742,281 ("the '281 patent"); 9,168,609 ("the '609 patent"); 9,393,639 ("the '639 patent"); and 9,757,814 ("the '814 patent).

The court conducted a Markman hearing on October 29, 2019 regarding patent claims in the four patents-in-suit.  After consideration of the parties' written and oral arguments regarding the claims in dispute, the court has construed several claim terms, as discussed below.

# I. FACTUAL AND PROCEDURAL BACKGROUND

This matter concerns four patents related to spot welding machines.[1] (Doc. 78 at 5). Spot welding is used to fuse sheets of metal together. (*Id.*). A spot welding machine generally has two elongated electrodes that are positioned opposite each other along the same axis. (*Id.*) Protective caps made of a rigid metal like copper are affixed to the ends of the electrodes. (Doc. 78 at 6).

During the welding process, the sheets of metal are positioned between the caps of the two electrodes, and the caps provide a clamping force to hold the sheets of metal together before the weld is formed. (*Id.*). Electrical current is applied to form the weld. (*Id.*). The current generates heat which causes the sheets of metal to fuse together at the point where the electrode caps apply the clamping force. After repeated use, the caps wear out and must be replaced. (Doc. 78 at 7). To replace the caps, the worn cap must be detached, and a new cap affixed to the electrode. (*Id.*).

The patents-in-suit address spot welding cap changers which supply protective caps that can be automatically accessed and replaced on the end of spot welding electrodes. The patents-in-suit are part of the same patent family. The '814 patent is a continuation of the '639 patent, which is a continuation of the '609

---

[1] The technical background that follows is adapted from Copperhead's opening claim construction brief. (Doc. 78 at 5–7). Changer & Dresser "generally agrees with the technical background and overview of the patent-in-suit" that Copperhead provided in its brief. (Doc. 83 at 6). Therefore, the court adopts those representations for purposes of this opinion.

patent, which is a continuation of the '281 patent. (*See* Doc. 100-2 at 2; Doc. 100-3 at 2; Doc. 100-4 at 2). All of the patents have the same specification. (Doc. 100-1; Doc. 100-2; Doc. 100-3; Doc. 100-4).

In the operative complaint, Copperhead alleges that C&D has infringed the four patents-in-suit and has induced others to infringe one of the patents. (Doc. 100 at 4–9). C&D filed counterclaims seeking a declaratory judgment that it has not infringed any valid, enforceable claim of the patents-in-suit; that the patents-in-suit are invalid; and that the patents-in-suit are unenforceable. (Doc. 140 at 22–43). The parties now ask the court to construe disputed claim terms recited in the patents-in-suit.

## II. LEGAL STANDARD

"It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quotation marks omitted). The purpose of claim construction is to determine the meaning and scope of a patent claim, and the exercise is a matter of law for the court. *O2 Micro Intern. Ltd. v. Beyond Innovation Tech. Co., Ltd.*, 521 F.3d 1351, 1360 (Fed. Cir. 2008) (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996)).

"Claim construction begins with the language of the claims." *Kaneka Corp. v. Xiamen Kingdomway Group Co.*, 790 F.3d 1298, 1304 (Fed. Cir. 2015) (citing *Phillips*, 415 F.3d at 1312–14). Courts generally should give the words of a claim their "ordinary and customary meaning," which is the "meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Phillips*, 415 F.3d at 1312–13. To make that determination, the court considers intrinsic evidence, which consists of the patent claims themselves, the specification, and the patent's prosecution history. *Phillips,* 415 F.3d at 1314–17.

"The specification contains a written description of the invention which must be clear and complete enough to enable those of ordinary skill in the art to make and use it." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). The specification is "the single best guide to the meaning of a disputed term." *Id.* For example, "the specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess," in which case "the inventor's lexicography governs." *Phillips*, 415 F.3d at 1316 (Fed. Cir. 2005). Or "the specification may reveal an intentional disclaimer, or disavowal, of claim scope by the inventor," in which case "the inventor has dictated the correct claim scope, and the inventor's intention, as expressed in the specification, is regarded as dispositive." *Id.*

In addition to the specification, the court "should also consider the patent's prosecution history, if it is in evidence," when construing a patent claim. *Id.* at 1317 (quotation marks omitted). The prosecution history "consists of the complete record of the proceedings before the [Patent and Trademark Office] and includes the prior art cited during the examination of the patent." *Phillips*, 415 F.3d at 1317. The Federal Circuit has cautioned that "because the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Id.* However, "the prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Id.*

Although less significant than intrinsic evidence, the court also may rely on extrinsic evidence, which consists of "expert and inventor testimony, dictionaries, and learned treatises." *Phillips*, 415 F.3d at 1317 (quotation marks omitted). When "considered in the context of the intrinsic evidence," extrinsic evidence "can help the court determine what a person of ordinary skill in the art would understand claim terms to mean." *Id.* at 1319.

## III.  DISCUSSION

The parties originally disputed the construction of over two dozen claim terms or phrases with respect to the four patents-in-suit.  (Doc. 75 at 5-8; Doc. 143-1 at 1-4).  The parties have agreed upon the construction of five terms.  (Doc. 170).  At the court's instruction, the parties narrowed the remaining disputed claim terms or phrases to those most significant to resolution of this action.  (Doc. 167).  The court addresses each term below.[2]

*1.*     *"spring box"*

The parties disagree on the construction of "spring box" as used in claim 21 of the '281 patent; claims 1, 12, and 13 of the '609 patent; and claims 16, 32, and 50 in the '639 patent.

Copperhead's proposed construction is "a container distinct from the cap carrier that includes a spring-like element providing a torsion force to advance the welding caps contained within the cap carrier."  (Doc. 75 at 5).[3]  C&D's proposed construction is "a container, which is a separate, independent and distinct structural component from the cap carrier, that holds a spring."  (Doc. 75 at 5).  C&D argues that the claim language, the specification, and the prosecution history all support

---

[2] The court will construe any remaining disputed claims, if necessary, at a later date.

[3] In the parties' joint statement regarding disputed terms, Copperhead proposed an alternative construction of "an enclosure within which a spring is anchored."  (Doc. 75 at 5).  But Copperhead advanced no argument with respect to this proposed construction in its briefs or during the Markman hearing.  (*See* Doc. 78 at 24–25; Doc. 88 at 17–20).  Therefore, the court does not consider Copperhead's proposed alternative construction.

its construction of "spring box" which requires a structural separation. The court agrees.

Starting with the claim language itself, claim 21 of the '281 patent states that the cap magazine is comprised of two components: a cap carrier and a spring box. (Doc. 100-1 at 10). Because claim 21 of the '281 patent lists the cap carrier and spring box as separate elements, "the clear implication of the claim language" is that those elements are "distinct component[s]" of the patented invention. *Gaus v. Conair Corp.,* 363 F.3d 1284, 1288 (Fed. Cir. 2004); *Engel Indus., Inc. v. Lockformer Co.,* 96 F.3d 1398, 1404–05 (Fed. Cir. 1996) (when a claim provides for two separate elements, a "second portion" and a "return portion," these two elements "logically cannot be one and the same").

In addition to listing the cap carrier and spring box as two separate components, claim 21 of the '281 patent identifies the function of the spring box: "a spring box for driving the spot welding caps within the cap carrier. . .the spring box providing an advancing force to advance the caps one by one so that the caps bear against a stop in the cap magazine in an access position." (Doc. 100-1 at 10). If the spring box drives the cap carrier, then the two structures must be separate. Otherwise, the spring box "has no role in the claim" and "is entirely superfluous." *Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 950 (Fed. Cir. 2006); *see also Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc.*, 381 F.3d 1111,

1119 (Fed. Cir. 2004) ("If, as Safari proposes, the claim refers in the abstract to the creation of a filter assembly structure, without any grounding to an intended use, the term 'operatively' is unnecessary and superfluous as the patentee could have as easily used the term 'connected' alone.").

Other claim language is instructive. For instance, claim 22 of the '281 patent and claim 1 of the '609 patent state that the spring box "includes a spring, one end of which is fixed at the spring box, and the other end of which is fixed at the cap carrier." (*Id.*; *see also* Doc. 100-2 at 11). These claims demonstrate a physical separation between the spring box and the cap carrier because the claims recite that each end of the spring is attached to two separate components. *See CAE Screenplates, Inc. v. Heinrich Fiedler GmbH & Co.,* 224 F.3d 1308, 1317 (Fed. Cir. 2000) ("In the absence of any evidence to the contrary, we must presume that the use of . . . different terms in the claims connotes different meanings.").

In addition to the claim language, the specification supports C&D's proposed construction. The specification states that "each cap magazine contains a cap carrier, which, driven by a spring box, presses by way of its advancing force one of the caps respectively against the stop." (Doc. 100-1 at 8). Like the nearly identical claim language discussed above, this language from the specification reinforces that the spring box must be an independent structure from the cap carrier because the spring box has a function relative to the cap carrier. The specification

also states a "preloaded spindle or spiral spring is arranged centrally in the spring box [], one end of the spring being fixed to the spring box [], the other to the cap carrier." (Doc. 100-1 at 9). This language also demonstrates that the spring box must be an independent structure from the cap carrier because one end of the spring is attached to some component (*i.e.* the spring box) other than the cap carrier itself. The specification further explains that the spring box "carr[ies] the bracket [] so that it can be radially moved." (Doc. 100-1 at 9). Thus, one function of the spring box as identified in the specification is to hold the bracket, and without some structure independent from the cap carrier, there would be nothing to support the bracket.

In addition, the specification contains an embodiment of the spring box in Figure 5 and notes that the figure shows the spring box "in the centre of the cap carrier." (Doc. 100-1 at 9). The court agrees with C&D that the specification discloses only one embodiment which shows the spring box as a separate and independent container. (*See* Doc. 83 at 16). The court is mindful that the Federal Circuit has "expressly rejected the contention that if a patent describes only a single embodiment, the claims of the patent *must* be construed as being limited to that embodiment." *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004) (emphasis added). However, it is entirely appropriate to construe claims consistent with a single embodiment where, as here, other intrinsic evidence

reveals the limiting nature of the claims. *Id.* at 907 (courts may construe claims as limited to the sole embodiment when "specific reasons" exist "dictating a narrow claim construction beyond the mere fact that the specification disclosed only a single embodiment or a particular structure").

Finally, the prosecution history reinforces that there must be a structural separation between the cap carrier and the spring box. In its preliminary response before the Patent and Trademark Office during the prosecution of the '281 patent,[4] Copperhead made numerous arguments indicating that the spring box and the cap carrier must be construed as independent or separate structures. For example, Copperhead stated that "under the proper interpretation of claims 21 and 22, the spring box must be a structure independent and distinct from the cap carrier." (Doc. 84-9 at 32). Copperhead also explained that claim 1 of the '281 patent indicates that that spring box drives the cap carrier which "plainly contemplates a structural separation between the two components." (Doc. 84-9 at 33) (emphasis added). In addition, Copperhead noted that "the spring box described in claim 21 must be separate and distinct from the cap carrier if the spring as described in claim 22 has one end fixed to the spring box and the other end fixed to the cap

---

[4] JEC's preliminary response addressed the "spring box" limitation in the context of claims 21 and 22 of the '281 patent, but "the prosecution history of one patent is relevant to an understanding of the scope of a common term in a second patent stemming from the same parent application." *Microsoft Corp. v. Multi-Tech Sys., Inc.*, 357 F.3d 1340, 1349 (Fed. Cir. 2004). Therefore, Copperhead's statements with respect to "spring box" in claims 21 and 22 of the '281 patent apply equally to all other claims in the '609 and '639 patent that recite "spring box."

carrier." (Doc. 84-9 at 34). Copperhead also stated that the "written description and drawings further confirm that the spring box is a component distinct and separate from the cap carrier." (Doc. 84-9 at 34). Copperhead summarized its argument this way: "In short, the specification supports the conclusion that the spring box is a separate structural component of the cap magazine distinct from the cap carrier." (Doc. 84-9 at 34).

Moreover, in distinguishing its patent from prior art, Copperhead again reiterated that the '281 patent requires that the cap carrier and the spring box be separate components. First, as to the Koch patent, Copperhead explained that the "spring box must be a separate and distinct element from the cap carrier, which magazine chambers 5a and 5b (of the Koch patent) are not." (Doc. 84-9 at 40). Second, with respect to the Takaba patent, Copperhead noted that C&D failed to "identify a component in Takaba that corresponds to a 'cap carrier' and a separate and distinct component in Takaba that corresponds to a 'spring box'" (doc. 84-9 at 48) because "cylinder 61 [of Takaba] cannot be both the cap carrier that receives the caps and the box of spring 62 [of Takaba]" (doc. 84-9 at 50–51).

Copperhead claims that its proposed construction of "spring box" is identical to the construction it advanced during the prosecution history of the '281 patent. (Doc. 88 at 20). As a technical matter that may be true. The claim construction section of Copperhead's preliminary response urged the Patent Trial and Appeal

Board to construe the term "spring box" as "a container distinct from the cap carrier that includes a spring-like element providing a torsion force to advance the welding caps contained within the cap carrier." (Doc. 84-9 at 36). This construction mirrors the construction that Copperhead proposes here. But Copperhead overlooks the numerous limiting statements outlined above in which Copperhead repeatedly argued that the spring box must be a separate or independent structure from the cap carrier—not merely distinct from the cap carrier. The court will not construe the scope of "spring box" more broadly than Copperhead envisioned.

In sum, based on the intrinsic evidence, the court finds that "spring box" is "a container, which is a separate, independent and distinct structural component from the cap carrier, that holds a spring."

2. *"spring advancing caps"*

The parties group four different claim phrases under the heading "spring advancing caps." (*See* Doc. 144 at 10-13; Doc. 145 at 14). These terms include: (1) "a spring for driving a cap carrier, the spring providing an advancing force to advance the caps" as used in claims 58 and 67 of the '814 patent; (2) "driving rotation of the cap carrier with a spring" as used in claim 10 of the '814 patent; (3) "a spring for rotating the cap carrier to advance the caps one by one" as used in claims 20 and 77 in the '814 patent; and (4) "a spring for advancing the caps one

by one" as used in claims 29, 39, 48, 68, and 86 in the '814 patent. (*Id.*). Each of these phrases relates to the spring advancing or driving the cap carrier or caps within the carrier. (Doc. 144 at 11; Doc. 145 at 15).

The parties' dispute over the construction of these phrases is whether the spring must be located within a spring box. (Doc. 144 at 10-13; Doc. 145 at 14). Copperhead contends that these claims should not be construed as requiring a spring box. (Doc. 144 at 10-11). C&D argues that when read in light of the specification and prosecution history, the claims should be construed as requiring a spring box. (Doc. 145 at 14-23).

The claim language itself appears to support Copperhead's position because the relevant claims in the '814 patent do not use the phrase "spring box." But some context is helpful. The '281 patent claims recite a "spring box" for driving or advancing the cap carrier. (*See* Doc. 100-1 at 10). The original claims in the '609 patent recited an "actuator" instead of a "spring box." (Doc. 84-4 at 3–7). During prosecution of the '609 patent, Copperhead amended the claims to state that that "actuator" includes a "spring box that includes a spring." (Doc. 84-4 at 18–10; *see* Doc. 100-2 at 10–11). The '639 and '814 patent claims only recite a "spring." (Doc. 100-3 at 10–11; Doc. 100-4 at 10–11).

C&D argues that the only embodiment disclosed in the specification does not contemplate a cap magazine without a spring box. (Doc. 145 at 15). The court

agrees, but this issue alone is not dispositive because "[e]ven when the specification describes only a single embodiment, the claims of the patent will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using words or expressions of manifest exclusion or restriction." *Liebel-Flarsheim Co.*, 358 F.3d at 906 (quotations omitted). The specification and the prosecution history contain limiting language that Copperhead cannot now disavow.

The specification states that the spring box is part of the "solution" for the stated object of the invention which is "to provide for an automatic faster and safer exchange of the spot welding caps both at mobile and stationary spot welding installations with a short access distance." (Doc. 100-4 at 9). *See SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1343 (Fed. Cir. 2001) ("[T]he characterization of the coaxial configuration as part of the 'present invention' is strong evidence that the claims should not be read to encompass the opposite structure."); *Toro Co. v. White Consol. Indus., Inc.*, 199 F.3d 1295, 1301 (Fed. Cir. 1999) (limiting a claim to what was disclosed in the specification because the specification described the particular component "as important to the invention"). Moreover, the specification discloses only one structure for driving the cap carrier or advancing the caps within the carrier: a spring box. (*See* Doc.

100-4 at 9).  Therefore, the court finds that the claim language, as read in light of the specification, limits "spring advancing caps" to a spring within a spring box

The prosecution history confirms this limitation.  As Copperhead expressly acknowledged in its preliminary response during the *Inter Partes* Review of the '281 patent, "[t]he only element disclosed in the specification for driving the welding caps in the cap carrier to the access position is the spring box."  (Doc. 84-9 at 34).

Contrary to Copperhead's argument with respect to this claim (*see* Doc. 144 at 15), the court is not limiting the claim to a preferred (and in this case, only) embodiment.  Rather, the court finds no basis in the written description or the prosecution history for construing "spring advancing caps" to mean anything other than including a spring box.    Accordingly, "spring advancing caps" means "a spring, within a spring box, for driving the cap carrier, the spring exerting a force to advance the caps."

3.    *"actuator" and "the actuator providing an advancing force to advance the caps"*

The parties disagree on the construction of "actuator" and "the actuator providing an advancing force to advance the caps" as used in claims 1 and 6 of the '609 patent.

a. "actuator"

Copperhead's proposed construction of "actuator" is "a mechanical device for moving something." (Doc. 75 at 6). C&D argues that the term "actuator" is indefinite. (*Id.*). Alternatively, C&D proposes that "actuator" must be construed as a "spring box" to maintain the relevant claims' validity. (*Id.*; *see also* Doc. 83 at 28–29).

The court rejects C&D's indefiniteness challenge at this stage in the proceedings. The Patent Act mandates that a patent specification, which is the written portion of a patent, "shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention. 35 U.S.C. § 112, ¶ 2 (2006).[5] A patent claim is invalid for indefiniteness when "viewed in light of the specification and prosecution history," the claims fails to "inform those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 910 (2014). The court may find a claim is indefinite only "where an accused

_____

[5] "Congress amended 35 U.S.C. § 112 when it passed the Leahy-Smith America Invents Act ("AIA"), and the amendments took effect on September 16, 2012." *Advanced Ground Information Systems, Inc. v. Life360, Inc.*, 830 F.3d 1341, 1343 n.1 (Fed. Cir. 2016) (citing Pub. L. No. 112-29, § 4 125 Stat. 284, 296-97 (2011)). Section 112 now states that "[t]he specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the inventor or a joint inventor regards as the invention." 35 U.S.C. § 112(b). The patents-in-suit claim priority to an application filed before September 16, 2012. (*See* Doc. 100-1 at 2). Therefore, the pre-AIA version of § 112 governs interpretation of the patent-in-suit. *See Life360, Inc.*, 830 F.3d at 1343 n.1.

infringer shows by clear and convincing evidence that a skilled artisan could not discern the boundaries of the claim based on the claim language, the specification, and the prosecution history, as well as her knowledge of the relevant art area." *Halliburton Energy Servs., Inc. v. M-I LLC*, 514 F.3d 1244, 1249–50 (Fed. Cir. 2008).

C&D argues that the term "actuator" is indefinite because the term does not appear anywhere in the specification, and the specification does not reference a structure that might correspond to an "actuator" that is separate from a "spring box". (Doc. 83 at 27; *see also* Doc. 100-2 at 2–10). Copperhead contends that the term actuator is well-known and readily understood by a personal of ordinary skill in the art as evidenced by the dictionary definition: "a mechanical device for moving something." (Doc. 88 at 24; *see also* Doc. 79-5 at 3). C&D responds that simply because a term can be found in a dictionary does not mean that the claims inform with reasonable certainty those skilled in the art about the scope of the invention. (Doc. 89 at 17). However, C&D offers no evidence—much less clear and convincing evidence—that a person of ordinary skill in the art would not understand the term actuator. (*See generally* Doc. 83 at 27–29; Doc. 89 at 17–19). Therefore, C&D has not met its burden of establishing that "actuator" is indefinite.

C&D alternatively urges the court to adopt its construction of "actuator" as meaning "spring box" to preserve the validity of the relevant claims under the first

paragraph of Section 112 of the Patent Act. (Doc. 83 at 28–29; Doc. 89 at 18). This section states that the specification must "contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same." 35 U.S.C. § 112(a). Known as the "written description" clause, this section "has been construed to mandate that the specification satisfy two closely related requirements." *LizardTech, Inc. v. Earth Resource Mapping, Inc.*, 424 F.3d 1336, 1344 (Fed. Cir. 2005). "First, it must describe the manner and process of making and using the invention so as to enable a person of skill in the art to make and use the full scope of the invention without undue experimentation." *Id.* at 1344–45. "Second, it must describe the invention sufficiently to convey to a person of skill in the art that the patentee had possession of the claimed invention at the time of the application, i.e., that the patentee invented what is claimed." *Id.* at 1345. An alleged infringer must show "by clear and convincing evidence that the written description requirement has not been satisfied." *Invitrogen Corp. v. Clontech Labs., Inc.*, 429 F.3d 1052, 1072 (Fed. Cir. 2005).

C&D contends that the patents-in-suit disclose a "single, very specific embodiment that uses a spring box to rotate the cap carrier," and this specification "would not convey to those skilled in the art that, at the time of invention, the

inventor of the patents-in-suit had invented any other kind of 'actuator' that rotates the cap carrier, nor would the specification enable those skilled in the art to make a magazine with an actuator that was separate from the spring box." (Doc. 83 at 28). Therefore, according to C&D, "[i]f not limited to 'spring box,' the claims reciting an 'actuator' would be invalid for lack of enablement and written description." (Doc. 83 at 28). But "the failure of the specification to specifically mention a limitation that later appears in the claims is not a fatal one when one skilled in the art would recognize upon reading the specification that the new language reflects what the specification shows has been invented." *All Dental Prodx, LLC v. Advantage Dental Prods., Inc.*, 309 F.3d 774, 779 (Fed. Cir. 2002). C&D cites no evidence from which the court could conclude that this is not the case. Accordingly, the court finds that C&D has not satisfied its burden of showing by clear and convincing evidence that the claims reciting an "actuator" are invalid for lack of a written description.

Because C&D has presented no evidence to support its indefiniteness and invalidity challenges, the court will reconsider those issues on a more fully developed record. The additional evidence on those issues will inform the court's analysis with respect to construction of the term "actuator." Therefore, the court defers construction of the term.

<u>b.</u>    <u>"the actuator providing an advancing force to advance the caps"</u>

Copperhead contends that no construction is necessary with respect to "the actuator providing an advancing force to advance the caps," and the court should give the term its ordinary and customary meaning. (Doc. 75 at 6). Alternatively, Copperhead proposes the following construction: "the actuator (as defined herein) provides a force to advance or transport the spot welding caps toward a stop (as defined herein)." (*Id.*).

C&D argues that the term "the actuator providing an advancing force to advance the caps" is indefinite. (Doc. 75 at 6). Alternatively, C&D proposes that the term means "the spring box exerting a force to advance the caps" (Doc. 75 at 6).

With the exception of the meaning of "actuator," there is no dispute about "the actuator providing an advancing force to advance the caps." (*See generally* Doc. 78 at 30-31; Doc. 83 at 27-29; Doc. 88 at 24-26; Doc. 89 at 17-19). For the same reasons explained above with respect to "actuator," the court defers construing "the actuator providing an advancing force to advance the caps," at this stage in the proceedings.

4. *"a gripper which in response to a turning and axial extraction movement detaches a spot welding cap of a pincer spot welding head" and "a gripper which in response to an extraction movement detaches a spot welding cap of a pincer spot welding head"*

The parties disagree on the construction of "a gripper which in response to a turning and axial extraction movement detaches a spot welding cap of a pincer spot welding head" as used in claim 6 of the '609 patent, and "a gripper which in response to an extraction movement detaches a spot welding cap of a pincer spot welding head" as used in claim 17 of the 639 patent.

    a. <u>"a gripper which in response to a turning and axial extraction movement detaches a spot welding cap of a pincer spot welding head"</u>

Copperhead's proposed construction of "a gripper which in response to a turning and axial extraction movement detaches a spot welding cap of a pincer spot welding head" is "a component in the robotic system that grasps an object detaches from a spot welding cap of a pincer spot welding head in response to relative rotational movement and axial pulling-off movement." (Doc. 75 at 5).

C&D's proposed construction of the phrase is "a component, which in response to a single rotational and axial movement of the pincer spot welding head, detaches a spot welding cap of a pincer spot welding head." (*Id.*).

There are three central disputes with respect to this term. First, the parties disagree about the construction of "gripper" as used in the term. Second, the

parties dispute whether the gripper performs the turning and axial extraction movement or whether the gripper clamps the cap tightly and detaches the cap in response to a turning and axial movement performed by the welding head. Third, the parties dispute whether the extraction movement is one movement that is both rotational and axial or whether the claim covers two separate extraction movements—one axial and one rotational.

Regarding "gripper," Copperhead proposes to incorporate the scientific and technical definition of the term "gripper" which is "a component of a robot that grasps an object." (Doc. 78 at 32). The court rejects this construction for the same reasons explained below with respect to term 6. *See infra* pp. 28–29. For its part, C&D proposes to use a generic term "component" to describe the "gripper." (Doc. 83 at 22; Doc. 89 at 11). The court rejects this construction as well and adopts the construction of "gripper" proposed by C&D and adopted by the court below concerning term 6 because "gripper" should retain a consistent construction throughout related claim terms. *Research Plastics, Inc. v. Federal Packaging Corp.*, 421 F.3d 1290, 1295 (Fed. Cir. 2005) ("[C]laim terms are presumed to be used consistently throughout the patent, such that the usage of a term in one claim can often illuminate the meaning of the same term in other claims."). Therefore, for purposes of this term, "gripper" means "a device that grips a spot welding cap to remove it from a pincer spot welding head." *See infra* pp. 28–29.

With respect to the second and third areas of dispute regarding whether the gripper can perform the extraction movement and whether that movement is one single movement, the intrinsic evidence supports C&D's proposed construction on both issues.

Claim 6 of the '609 patent states that the cap changer is comprised of a cap extractor having "a gripper which in response to a turning and axial extraction movement detaches a spot welding cap of a pincer spot welding head." (Doc. 100-2 at 11). Because the gripper detaches a spot welding cap "in response to" some movement, a component other than the gripper must perform the extraction movement. The claim makes little sense if the gripper performs the extraction movement because the gripper's purpose is to prevent the spot welding head from twisting or rotating. Therefore, the gripper cannot both turn the caps and simultaneously prevent the caps from twisting. The specification confirms this interpretation. The specification includes an embodiment of the gripper which shows one fixed jaw and one movable jaw that pivots to clamp a spot welding cap. (Doc. 100-2 at 5, 9–10). The specification discloses no mechanism by which the jaws of the gripper also could extract the spot welding cap.

Regarding the nature of the turning and axial movement, the court finds that that the claim contemplates one single movement that is simultaneously turning and axial. The claim language refers to "a turning and axial extraction movement."

(Doc. 100-2 at 11). In construing patent terms, there is not "a hard and fast rule that 'a' always means one or more than one." *Harari v. Lee*, 656 F.3d 1331, 1341 (Fed. Cir. 2011). Rather, the court reads "the limitation in light of the claim and specification to discern its meaning." *Id.*

Here, the claim indicates that a single movement provides the impetus for the gripper to detach the spot welding cap. As an initial matter, the claim refers to one "movement," not movements and not both a turning movement and an axial movement. Moreover, basic grammar suggests that "turning and axial" modify and describe the type of single movement. There is nothing in the claim language to suggest that the patentee contemplated that multiple movements would provide the impetus for detaching the spot welding heads. The patentee's use of plural forms of various phrases elsewhere in the same claim and in other claims further demonstrates the point. For example, claim 6 of the '609 patent recites "*at least one* cap magazine" that receives "a *plurality* of spot welding caps." (Doc. 100-2 at 11). Thus, the patentee knew how to draft claims that would encompass one or more elements, but the patentee did not use similar language when drafting "a turning and axial movement."

The specification likewise refers to "a turning and axial pulling-off movement," not movements, and not both a turning movement and an axial movement. (Doc. 100-2 at 2, 9).

Accordingly, "a gripper which in response to a turning and axial extraction movement detaches a spot welding cap of a pincer spot welding head" means "a device that grips, which in response to a single rotational and axial movement of the pincer spot welding head, detaches a spot welding cap of a pincer spot welding head."

  b.  "a gripper which in response to an extraction movement detaches a spot welding cap of a pincer spot welding head"

Copperhead's proposed construction of "a gripper which in response to an extraction movement detaches a spot welding cap of a pincer spot welding head" is "a component in a robotic system that grasps an object detaches a pincer spot welding head in response to a pulling movement." (Doc. 75 at 6).

C&D's proposed construction of the term is "device that removes a spot welding cap of a pincer spot welding head in response to an extraction movement performed by a device that is different than the device that removes the cap." (*Id.*).

This term is nearly identical to term 4.a., except that this term does not state that the extraction movement is "turning and axial." Therefore, for the reasons explained above, *see supra* pp. 21–25, the court finds that "a gripper which in response to an extraction movement detaches a spot welding cap of a pincer spot welding head" is "a device that grips removes a spot welding cap of a pincer spot welding head in response to an extraction movement performed by a device that is different than the device that removes the cap."

5.      *"the spot welding cap is clamped by the gripper to prevent the spot welding cap from twisting"*

The parties disagree on the meaning of the "the spot welding cap is clamped by the gripper to prevent the spot welding cap from twisting" as used in claim 6 of the '609 patent.

Copperhead's proposed construction is "a component in a robotic system that grasps an object clamps a spot welding cap introduced into the gripper from the shaft of a pincer welding head in such a way as to prevent twisting of the spot welding cap." (Doc. 75 at 5).[6]

C&D's proposed construction is "the spot welding cap is [clamped][7] by the gripper so that the spot welding cap does not twist while it is detached from the pincer spot welding head." (Doc. 75 at 5).

The primary dispute over this term is whether the claim contains a temporal limitation such that the spot welding cap is prevented from twisting "while it is detached from the pincer spot welding head." (Doc. 89 at 10).  The claim language and the specification support such a limitation.

---

[6] In its reply brief, Copperhead offers a proposed alternative construction of "a component in a robotic system that grasps an object clamps a spot welding cap to prevent the spot welding cap from twisting." (Doc. 88 at 29).  Generally, parties cannot raise new arguments in a reply brief, and Copperhead made no argument concerning this alternative construction during the Markman hearing.  Therefore, the court does not consider the proposed alternative construction.

[7] C&D originally proposed the word "held" for "clamped." (Doc. 75 at 5).  C&D now is "agreeable to using the term 'clamped.'" (Doc. 83 at 21).

Claim 6 of the '609 patent states that the spot welding cap changer is comprised of "a cap extractor having a *gripper* which in response to a turning and axial extraction movement *detaches a spot welding cap* of a pincer spot welding head inserted into the gripper from a shaft of the pincer spot welding head *in such a way that the spot welding cap is clamped by the gripper to prevent the spot welding cap from twisting*." (Doc. 100-2 at 11) (emphasis added). Similarly, the specification states that the cap changer's puller has a gripper "with spring-loaded pivotable jaws [] which in response to a turning and axial pulling-off movement *detaches a spot welding cap* [] of a pincer spot welding head introduced into it from a shaft of the pincer welding head *in such a way that it is clamped to prevent it twisting*." (Doc. 100-2 at 2) (emphasis added).

The plain language of the claim and the specification demonstrate a temporal constraint whereby the prevention of twisting is connected to the detaching. In other words, preventing the spot welding cap from twisting must take place while the cap is being detached. Otherwise, the cap would not be removed.

Copperhead claims that C&D's introduction of the word "detached" is superfluous because the word is included in two other terms which are part of the same limitation (*see* claims 4.a. and 4.b. above). The court disagrees. The court finds that because the cap is already detached, then the addition of the temporal limitation simply clarifies the point and makes the term easier to understand.

Copperhead also challenges C&D's failure to define "gripper." (Doc. 78 at 34). C&D submits that "gripper" needs no construction and would be understood by a person of ordinary skill in the art as a component that grips an object. (Doc. 83 at 21). The court agrees. But to the extent gripper needs definition, then "gripper" is defined as explained with respect to claim 6 below. *See infra* pp. 28–29.

Therefore, "the spot welding cap is clamped by the gripper to prevent the spot welding cap from twisting" means "the spot welding cap is clamped by the gripper [as defined herein] so that the spot welding cap does not twist while it is detached from the pincer spot welding head."

6.    *"a gripper for removing a spot welding cap from a pincer spot welding head"*

The parties disagree on the meaning of "a gripper for removing a spot welding cap from a pincer spot welding head" as used in claims 77 and 86 of the '814 patent.

Copperhead's proposed construction is "a component in a robotic system that grasps an object for removing a spot welding cap from a pincer spot welding head." (Doc. 143-1 at 3).

C&D's proposed construction is "a device that grips a spot welding cap to remove it from a pincer spot welding head." (*Id.*).

Copperhead's proposed construction adopts the scientific and technical dictionary definition of "gripper." (Doc. 78 at 32; Doc. 79-6 at 3). This proposed construction is confusing and unsupported by the intrinsic evidence because there is no basis in the claim language or the specification for the requirement that the gripper be a component for a "robotic system." The court finds that "gripper" needs no additional construction other than that proposed by C&D which plainly and clearly states that the gripper is a device that "grips" the spot welding caps to remove them from the spot welding head.

Accordingly, "a gripper for removing a spot welding cap from a pincer spot welding head" means "a device that grips a spot welding cap to remove it from a pincer spot welding head."

7. *"wherein one end of the spring is firmly mounted in the center of the cap carrier"*

The parties disagree on the meaning of "wherein one end of the spring is firmly mounted in the center of the cap carrier" as used in claim 1 of the '814 patent.[8]

---

[8] The parties' proposed constructions with respect to this term also apply to the following '814 patent terms: "wherein the spring is located in the central cavity and is attached at one end to the spindle and at the other end to the cap carrier" as used in claims 58 and 67 of the '814 patent; "spindle or spiral spring that is arranged centrally in the cap carrier" as used in claim 1 of the '814 patent; "the spring is compartmentalized in the cap carrier" as used in claim 34 of the '814 patent; and "wherein the spring is arranged centrally in the cap carrier and the plurality of holes are positioned around the spring" as used in claim 26 in the '814 patent. (Doc. 144 at 13–14; Doc. 145 at 24 n.9).

Copperhead proposes that "cap carrier" should be construed as the parties have agreed[9] and that no further construction is necessary. (Doc. 143-1 at 1). C&D's proposed construction is "wherein one end of the spring is fixed to a spring box, said spring box is firmly mounted in the center of the cap carrier." (*Id.*). The parties' central dispute is whether the phrase must be limited to include a spring box.

Claim 1 of the '814 patent states that "one end of the spring is firmly mounted in the center of the cap carrier." (Doc. 100-4 at 11). The claim language itself tends to support Copperhead's proposed construction because the claim does not recite a "spring box." But the analysis does not end there.

Regarding the only embodiment of the open round magazine, the specification states that "[a] firmly mounted spring box [], schematically depicted, is in the centre of the cap carrier[], said spring box carrying the bracket [] so that it can be radially moved" and that "[a] preloaded spindle or spiral spring is arranged centrally in the spring box [], one end of the bring being fixed to the spring box [], the other to the cap carrier." (Doc. 100-4 at 10).

The specification does not contemplate a spring that is mounted in the center of the cap carrier, but not within a spring box. *See Merck & Co., Inc. v. Teva Pharms. USA, Inc.*, 347 F.3d 1367, 1371 (Fed. Cir. 2003) ("[C]laims must be

---

[9] The parties agree "cap carrier" should be construed as "a mechanism that holds and carries spot welding caps." (Doc. 144 at 20)

construed so as to be consistent with the specification, of which they are a part."). And the prosecution history confirms this limitation. During prosecution of the '281 patent, Copperhead distinguished its invention from the Japanese Takaba patent by arguing that the Takaba patent did not disclose a spring box that was separate from the cap carrier as required by the '281 patent claims. (Doc. 84-9 at 25–26). Copperhead's efforts to differentiate its invention from the Takaba patent is evidence that Copperhead understood its invention to require a spring box, making this claim scope narrower than it appears on its face. Thus, the prosecution history demonstrates that Copperhead disclaimed an invention that does not contain a spring box within the cap carrier.

Accordingly, "wherein one end of the spring is firmly mounted in the center of the cap carrier" means "wherein one end of the spring is fixed to a spring box, said spring box is firmly mounted in the center of the cap carrier."

8. *"spindle"*

The parties disagree on the meaning of "spindle" as used in claims 77 and 86 of the '814 patent.

Copperhead contends that no construction is necessary, and the court should give the term its ordinary and customary meaning. (Doc. 143-1 at 3). Alternatively, Copperhead argues that "spindle" means "a rod or pin serving as an axis around which something else rotates." (*Id.*).

C&D argues that the term "spindle" is invalid.  (*Id.*).  Alternatively, C&D submits that spindle means "spring box."  (Doc. 143-1 at 3).

Claims 58 and 67 of the '814 patent recite a "spindle located in the central cavity about which the cap carrier rotates."  (Doc. 100-4 at 13).  C&D contends that these claims are invalid for lack of a written description under the first paragraph of 35 U.S.C. § 112 because the specification contains no disclosure that would indicate that the inventor had possession of a spindle about which the cap carrier rotates.  (Doc. 145 at 29).

The specification states that "[a] preloaded spindle or spiral spring is arranged centrally in the spring box[], one end of the spring being fixed to the spring box[], the other to the cap carrier[]."  (Doc. 100-4 at 10).  Copperhead claims that based on this language, the specification discloses a spindle even though the spindle is not reflected in the drawings.  (Doc. 144 at 17–18).  C&D counters that the only portion of the specification that references a "spindle spring" indicates that it does not include a "spindle" and is instead a "spring box."  (Doc. 145 at 29).  But again, [i]n order to comply with the written description requirement, the specification 'need not describe the claimed subject matter in exactly the same terms as used in the claims; it must simply indicate to persons skilled in the art that as of the [filing] date the applicant had invented what is now

claimed.'" *All Dental Prodx*, 309 F.3d at 779 (quoting *Eiselstein v. Frank*, 52 F.3d 1035, 1038 (Fed. Cir. 1995)).

Because C&D cites no evidence in support of its invalidity argument, the court finds that C&D has not met its burden of showing by clear and convincing evidence that a person of ordinary skill in the art would not understand that the inventor possessed the claimed invention as of the filing date. The court will revisit C&D's invalidity contention should C&D present evidence to the court. That evidence will bear on the court's claim construction analysis. Therefore, the court will not construe the term "spindle" until it can do so in light of consideration of the validity issue on a more fully developed record.

9.     *"elastic cap carrier"*

The parties dispute the meaning of "elastic cap carrier" as used in claims 9, 38, 47, 57, and 76 of the '814 patent.

Copperhead's proposed construction is "a cap carrier that holds welding caps via elasticity." (Doc. 143-1 at 1). C&D's proposed construction is "a cap carrier made of elastic material." (*Id.*).[10]

The court finds nothing in the claim language, the specification, or the prosecution history to support Copperhead's proposed construction. The court

---

[10] The parties agree that "cap carrier" should be construed as "a mechanism that holds and carries spot welding caps." (Doc. 144 at 20; Doc. 170 at 1).

agrees with C&D that because "elastic" precedes "cap carrier," the claim language and basic grammar suggest that "elastic" modifies cap carrier and describes a cap carrier made of elastic material.

Accordingly, "elastic cap carrier" means "a cap carrier made of elastic material."

## IV. CONCLUSION

The court orders that the disputed claims discussed above be construed as set forth in this memorandum opinion.

Consistent with the operative scheduling order, the parties **SHALL** conduct another mediation session within 45 days of entry of this opinion. (Doc. 87 at ¶ 1).

**DONE** and **ORDERED** this January 28, 2020.

_____
**ANNEMARIE CARNEY AXON**
UNITED STATES DISTRICT JUDGE